**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION**

ECIA TRUESDALE,

    Plaintiff,

vs.                Case No. 3:15-cv-1373-J-32PDB

CSX TRANSPORTATION, INC.,

    Defendant.

## ORDER

  Plaintiff Ecia Truesdale, who is African-American, worked for defendant CSX Transportation, Inc. ("CSXT") as a customer service representative and coordinator from June 2012 until August 2015 when CSXT terminated her employment. Truesdale sued under 42 U.S.C. § 1981, alleging CSXT harassed and discriminated against her based on her race (Count I) and retaliated against her for making complaints to the human resources department (Count II). CSXT has moved for summary judgment (Doc. 14), Truesdale responded (Docs. 18 & 19), and CSXT replied (Doc. 24). "Summary judgment is proper 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" Trask v. Sec'y, Dep't of Veterans Affairs, 822 F.3d 1179, 1184, n.1 (11th Cir. 2016) (quoting Fed.R.Civ.P. 56(a)).

**I.      Undisputed Facts**

In her job as a customer service representative, Truesdale worked with customers to track and locate freight on CSXT's rails and trucks. Doc. 14-5, Ex. 1; Doc. 18-6, Ex. 80. At some point her title changed to customer service coordinator, but her responsibilities remained the same. Doc. 18-6, Ex. 80. At her first year-end review, Truesdale's supervisor, Janel Williams (who is African-American), rated Truesdale's performance as unsatisfactory. Doc. 14-5, Ex. 5; Doc. 14-15 at ¶ 6. Truesdale disagreed with the rating. Doc. 14-5, Ex. 9. Williams provided Truesdale with detailed feedback as to why the rating was warranted. Doc. 14-5, Ex. 10.

Williams left CSXT in April 2013 and Debra Ghourley (who is white) then supervised Truesdale until November 2013 when Ghourley became the Director of Customer Service. Doc. 24-1. Ghourley completed Truesdale's 2013 year-end review and initially rated her performance as "fair." Doc. 14-5, Ex. 15. Truesdale disagreed with the rating and Ghourley, in consultation with her own supervisor (who is white) and the human resources director (who is African-American), changed Truesdale's score to "satisfactory" which, unlike the "fair" rating, entitled Truesdale to receive a raise. Doc. 14-2 at Tr.[1] 150; Doc. 14-5, Ex. 13, Ex. 17, Ex. 18. Ghourley explained that because she had not supervised Truesdale for the entire year, she

---

[1]"Tr." references are to the transcript pages of depositions. Docs. 14-1, 14-2, 14-3 and 14-4 are Truesdale's deposition (the transcript pages are sequential).

changed the rating to give Truesdale "the benefit of the doubt," Doc. 14-16 at ¶ 6, though Truesdale testified that Ghourley only grudgingly raised her rating, and reminded Truesdale on many occasions that she disagreed with the higher rating. Doc. 14-2 at Tr. 155-56.

Jennifer Perry (who is white) began supervising Truesdale in February 2014. Doc. 24-1 at ¶ 4; Doc. 14-2 at Tr.158, Doc. 14-6, Ex. 19.[2] In June 2014, Truesdale was counseled after sending her biggest customer an email telling the customer that her tone was "very disrespectful, rude and condescending," and that she was making Truesdale's work "very difficult." Doc. 14-6 at Ex. 22; Doc. 14-2 at Tr. 164. Perry completed Truesdale's 2014 year-end review, rating her as "sometimes achieves expectations," and noting that Perry was seeing improvement after "work[ing] through several issues" with Truesdale to help her better address her customers' needs. Doc. 14-6, Ex. 19. In February and March 2015 different coworkers complained to Perry about interactions with Truesdale. Doc. 14-7, Ex. 51, Ex. 53. In March 2015

---

[2] Truesdale testified that Perry supervised her in 2014, which is borne out by the mid- and year-end review documents. Doc. 14-2 at Tr. 158, Doc. 14-6, Ex. 19. However, Ghourley and Perry (who both apparently testified without reference to records) testified that Perry began supervising Truesdale in 2015. Doc. 14-10 at Tr. 12; Doc. 14-13 at Tr. 6-8. Truesdale's later affidavit also says that Perry began supervising her in 2015. Doc. 18-6, Ex. 80 Ghourley consulted CSXT personnel records and completed a subsequent declaration, clarifying that Perry supervised Truesdale beginning in 2014 (as Truesdale originally testified). Doc. 24-1 at ¶¶ 3-4. The Court does not find this to be a "genuine dispute" as to a "material fact" but provides this explanation to clarify the confusion in the record.

3

Truesdale was counseled for directing a customer to submit inquiries in a manner that created more work for the customer and made it appear that Truesdale was handling a high volume of inquiries. Doc. 14-7, Ex. 54, Ex. 55.

Then on May 26, 2015, accompanied by two human resources directors, LaTisha Thompson and Kelly Toaston (both African-American), Perry met with Truesdale and issued her a formal Performance Warning. Doc. 14-6, Ex. 25. Perry advised Truesdale that if she did not sustain acceptable performance over the next sixty days, she would be subject to further disciplinary action, up to and including termination. Id. Several days later, Truesdale sent a lengthy email to Toaston explaining that she felt she was being retaliated against and treated unfairly for having contacted human resources to dispute her performance reviews; she felt threatened and intimidated by Perry and Ghourley (who was now Perry's supervisor); and management was sabotaging her by not timely sharing performance information with her. Doc. 14-6, Ex. 27. Truesdale's email does not once mention race. Truesdale closed her letter by seeking Toaston's assistance in finding another position within CSX. Id. Truesdale applied for other open positions at CSX but was not selected. Doc. 14-6, Ex. 32, Ex. 33.

Meanwhile, Perry and Toaston met with Truesdale every two weeks for coaching sessions meant to improve her performance. Doc. 14-6, Ex. 31, Ex. 35; Doc. 14-7, Ex. 39, Ex. 40. However, Perry did not rate Truesdale's performance as

4

meeting expectations on a regular basis and at the end of the sixty days, Perry recommended to Ghourley that Truesdale be terminated. Doc. 14-10 at Tr. 35. Ghourley, Perry and Toaston met with Truesdale, and Ghourley terminated Truesdale on August 10, 2015.

## II. Discussion[3]

In her two count complaint, Truesdale alleges she was harassed and terminated because she is African-American and retaliated against for reporting

---

[3]The Court rejects Truesdale's efforts to cure her often evasive deposition testimony by the submission of an after-the-fact conclusory affidavit full of buzzwords seemingly designed to defeat summary judgment. (Doc.18-6, Ex. 80). The Court strikes paragraphs 6, 11, 29, 30 from that affidavit to the extent they are wholly conclusory and/or contradict her deposition testimony without any explanation as to why she testified under oath as she did. Truesdale testified that Ghourley did not like her, that Ghourley and Perry treated Truesdale's co-workers better than her, that Ghourley and Perry nitpicked her work. But she was unable to articulate any basis for a jury to believe this attitude had anything to do with her race as opposed to her performance (which the supervisor before Ghourley (who was African-American) also found to be deficient, rating her even worse than Ghourley did). While Truesdale's affidavit refers to different treatment accorded her "white" co-workers, her deposition testimony refers to different treatment accorded her "co-workers," who were white, African-American, and Hispanic. Moreover, when pressed as to the content of her conversations with human resources personnel wherein she advised them of her complaints, Truesdale could not confirm whether she ever actually told anyone at the time that she felt her race was the reason she was being mistreated. Rather, Truesdale explained that she felt she had "implied" to HR that race was a factor. Doc. 14-1 at 65-67, 74-85; Doc. 14-2 at Tr. 95, 96, 100-13, 118-21, 146-47; Doc. 24-1 at ¶¶ 10, 11. See Reese v. Herbert, 527 F.3d 1253, 1270 n. 28 (11th Cir. 2008) (explaining rule that "a party [who] has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact . . . cannot thereafter create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony") (quoting Van T. Junkins and Assoc., Inc. v. U.S. Indus., Inc., 736 F.2d 656, 657 (11th Cir. 1984)).

5

unlawful employment practices, all in violation of 42 U.S.C. § 1981. Doc. 1. Race discrimination and retaliation claims brought under § 1981 are analyzed in the same manner as claims brought under Title VII.[4] Rice-Lamar v. City of Ft. Lauderdale, 232 F.3d 836, 843 n.11 (11th Cir. 2000) (analyzing § 1981 claim of wrongful termination under Title VII framework); Bryant v. Jones, 575 F.3d 1281, 1296 n.20 (11th Cir. 2009) (stating that elements of a § 1981 claim of hostile work environment are same as those under Title VII); Goldsmith v. Bagby Elevator Co., Inc., 513 F.3d 1261, 1277 (11th Cir. 2008) (analyzing § 1981 and Title VII retaliation claims under the same standard).

### A.    Termination Claim (Count I)

Because Truesdale relies on circumstantial evidence to attempt to prove her race discrimination claim, the Court first addresses her claim under the McDonnell Douglas burden-shifting framework. Smith v. Lockheed-Martin, Corp., 644 F.3d 1321, 1325 (11th Cir. 2011) (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-05 (1973)). Barring success there, the Court may consider whether Truesdale has painted "a convincing mosaic of circumstantial evidence" from which a jury could infer intentional discrimination. Id. at 1328-29 (quotation and citation omitted).[5]

---

[4] The Court is dismayed to note that some of the cases cited by CSXT for this basic proposition are not accurately reported in its motion for summary judgment.

[5] Here too, CSXT ignores this aspect of the law in suggesting in its reply brief that plaintiff can only prevail via the McDonnell Douglas framework. Doc. 24 at 7. Binding

6

Starting first with the McDonnell Douglas analysis, Truesdale must establish a prima facie case of discrimination by showing "(1) that [she] is a member of a protected class (here, [African-American]); (2) that [she] was qualified for the position [she] held; (3) that [she] was discharged from that position; and (4) that in terminating [her] employment, [CSXT] treated [her] less favorably than a similarly-situated individual outside [her] protected class." Smith, 644 F.3d at 1325 (citing Maynard v. Bd. of Regents, 342 F.3d 1281, 1289 (11th Cir. 2003)). If Truesdale can establish a prima facie case, the burden shifts to CSXT to rebut the presumption that its decision to terminate Truesdale was motivated by race, which it may do by articulating a legitimate non-discriminatory reason for her termination. See Id. at 1325. If CSXT meets its burden of production, "the presumption of discrimination is rebutted" and "the inquiry 'proceeds to a new level of specificity,' whereby [Truesdale] must show [CSXT's] proffered reason to be a pretext for unlawful discrimination." Id. at 1325-26 (quoting EEOC v. Joe's Stone Crabs, Inc., 296 F.3d 1265, 1272 (11th Cir. 2002)).

The Court finds Truesdale cannot establish a prima facie case of discrimination because she cannot demonstrate that in terminating her employment, CSXT treated her less favorably than similarly-situated co-workers who were not African-American.

---

precedent holds otherwise. See Smith, 644 F.3d at 1328 ("[E]stablishing the elements of the McDonnell Douglas framework is not, and never was intended to be, the sine qua non for a plaintiff to survive a summary judgment motion in an employment discrimination case."); Flowers v. Troup Cty, Ga., Sch. Dist., 803 F.3d 1327, 1336 (11th Cir. 2015) (citing Smith for same proposition).

Truesdale testified that one white co-worker (Roxanne McElroy) received a "bad review" in 2013 but was not terminated, and two other white co-workers (Janeene Bartley and Patti Cole) performed as poorly as Truesdale but were not disciplined.[6] But Truesdale also testified that she had never seen Bartley or Cole's personnel files, Doc. 14-3 at Tr. 213; doesn't know if they were ever disciplined or how they scored on their performance reviews, id.; didn't know how many mistakes Bartley made, Doc. 14-1 at Tr. 90; hadn't seen any of McElroy's subsequent reviews, Doc. 14-2 at Tr. 92-93; was "making a guess" that McElroy had as many performance deficiencies as Truesdale, id. at Tr. 92; had never observed Cole's work, Doc. 14-3 at Tr. 213; and admitted that her source of information about Cole was "rumors in the grapevine." Doc. 14-2 at Tr. 92. In fact, neither McElroy, Bartley or Cole ever received an unsatisfactory performance review (as did Truesdale in 2012) and, other than McElroy's "fair" review in 2013 (the year Truesdale's initial "fair" review was subsequently changed to "satisfactory" at her request), all three of them performed

---

[6]At one point in her deposition, Truesdale said that only Bartley and Cole performed as poorly as her without being terminated, Doc. 14-2 at Tr. 93, so it is not clear that she considers McElroy to be a comparator. Her summary judgment response does not mention McElroy or Cole at all. While it does mention Bartley, it is only to say that Truesdale covered her customers while Bartley was on leave, that Bartley took a lot of leave, and that Bartley complained to Perry about Truesdale's handling of Bartley's customers and that Perry took Bartley's side without consulting Truesdale. See Doc. 19 at 4-5. However, to give Truesdale every benefit of the doubt, the Court considers Bartley, Cole and McElroy to be possible comparators.

better than Truesdale all four years they were evaluated. See Doc. 14-16 at ¶ 9.[7]

Truesdale also complains that she suffered mistreatment others did not, including receiving emails in all capital letters, being talked about, having an increased workload, being nitpicked and scrutinized, and not being selected to transfer to another position in the company. But these incidents are not adverse employment actions within the meaning of the law, whether viewed separately or cumulatively.[8] See Davis v. Town of Lake Park, 245 F.3d 1232, 1239, 1242, 1244,

---

[7]Truesdale offered only conclusory statements in her affidavit that white co-workers were treated differently than she was in that their mistakes were not escalated to management, they were not subject to discipline despite poor performances, and they were allowed to transfer to other positions. Doc. 18-6, Ex. 80 at ¶ 32. Like her deposition testimony, this is insufficient to create a genuine dispute as to any material fact. See Valderrama v. Rousseau, 780 F.3d 1108, 1112 (11th Cir. 2015) (explaining that in opposing summary judgment, "[c]onclusory allegations and speculation are insufficient to create a genuine issue of material fact."); Fed. R. Civ. P 56(c) and (e) (party opposing summary judgment must properly support assertions of fact).

    To the extent Truesdale argues that being put on the performance improvement plan ("PIP") (which preceded her termination) was itself the adverse employment action, she has not demonstrated a prima facie case as to this either, having failed to show that CSXT treated her less favorably. And, in any event, it is not clear that such placement would be deemed an adverse employment action. See, e.g., Hall v. Siemens VDO Auto., 481 F. App'x 499, 505 (11th Cir. June 21, 2012) (holding placement on a PIP is not an adverse action for a retaliation claim); Carroll v. Ceridian Benefits Servs., No. 8:11-cv-1063-T-24TGW, 2012 WL 5431007, *8 (M.D. Fla. Nov. 7, 2012) (holding placement on a PIP is not an adverse employment action in a race discrimination case).

[8]The sampling of monthly workload documents Truesdale supplied do not show that Truesdale had a higher workload than her co-workers. See Doc. 14-7 at Ex. 47, Ex. 48. (Truesdale did not know what year the documents reflected, Doc. 14-3 at Tr. 214.) Ghourley's second declaration states that CSXT's records for 2014 and January - July, 2015 (summarized in her declaration) reveal that Truesdale was

9

1245 (11th Cir. 2001) (holding that conduct is only actionable under Title VII's anti-discrimination clause if it effects "a serious and material change in the terms, conditions, or privileges of employment" "as viewed by a reasonable person in the circumstances" and that unfair work assignments, negative evaluations, criticism, loss of self-esteem, and loss of prestige, while unpleasant, are not actionable except in rare circumstances).

Furthermore, even if the Court found Truesdale was able to establish a prima facie case of discrimination, CSXT has put forward a legitimate, non-discriminatory reason to terminate Truesdale, as evidenced by the well-documented long-standing history of her poor performance on nearly every criteria CSXT measures. While Truesdale points to a few stray remarks that she contends support her theory of racial animus,[9] she has entirely failed to rebut CSXT's evidence that she was a poor

---

assigned less work than many of her co-workers. Doc. 24-1 at ¶ 9. Additionally, while Truesdale testified that two people were allowed to transfer out of Ghourley's supervision whereas she was not, one of the two was African-American, belying Truesdale's claim that a failure to let her transfer out was race-based discrimination. See Doc. 14-1 at Tr. 90; Doc. 14-2 at Tr. 91. (Truesdale also testified that a Caucasian employee transferred into her department but she did not know the circumstances, Doc. 14-2 at Tr. 91; thus, its relevance, if any, is insufficient to create a genuine dispute as to any material fact.)

[9]Truesdale's theory that racial animus was the cause of her demise at CSXT is based on Debra Ghourley having once complained about traffic and the loud and distracting noise caused by the Martin Luther King Day parade (whose route passes by CSXT and its parking area); a remark Ghourley made that the women are "trashy" on the television program "The Real Housewives of Atlanta" (Truesdale says the program features African-American women who Truesdale agreed wore revealing

performer and was rated as such by three different supervisors over three different years, including by an African-American supervisor. See Crawford v. City of Fairburn, 482 F.3d 1305, 1308 (11th Cir. 2007) (explaining that under McDonnell Douglas burden shifting analysis, "plaintiff must meet the reason proffered head on and rebut it") (citations omitted). Truesdale's claim that she suffered an adverse employment action based on race discrimination does not survive the McDonnell Douglas analysis.

Nor does the Court find Truesdale has presented "a convincing mosaic of circumstantial evidence" from which a jury could infer intentional discrimination as the basis for CSXT taking adverse employment action against her. Smith, 644 F.3d at 1328-29. Truesdale's evidence includes the remarks Ghourley said (or maybe said) that offended Truesdale (recounted in fn. 9); that a three person panel (of which Ghourley and African-American Human Resources Director LaTisha Thompson were members) did not select another African-American person for a promotion (Truesdale did not apply for that position) (see Doc. 14-2 at Tr. 147); the hearsay that Sherita Jacobs, an African-American co-worker who transferred out of Ghourley's

---

clothing, used foul language, and hit each other); and a remark Truesdale "thought" she overheard Ghourley make that the Trayvon Martin shooting was justified (the Trayvon Martin shooting was a highly publicized case in which a 17 year old unarmed African-American high school student was shot and killed by a neighborhood watch coordinator who a jury acquitted (see State v. Zimmerman, No. 2012-CF001083-A, available at http://flcourts18.org/?page_id=969)). None of these comments were directed to Truesdale but she overheard them. See Doc. 14-1 at Tr. 49-57; Doc. 14-2 at Tr. 134-35.

11

supervision, told Truesdale that she thought Ghourley was discriminating against her (Jacobs) based on her race (see Doc. 14-3 at Tr. 232-33); and Truesdale's own view that the treatment she received was because she is African-American (see Doc. 14-2 at Tr. 111-12, Doc. 14-3 at Tr. 178). No jury could infer intentional discrimination on this thin record. See, e.g., Connelly v. Metro. Atlanta Rapid Trans. Auth., 764 F.3d 1358, 1364 (11th Cir. 2014) (contrasting plaintiff's weak evidence with "compelling evidence" of discrimination presented in Smith).

### B.     Harassment Claim (Count I)

Truesdale also asserts a race-based hostile work environment claim. To prove this claim, Truesdale must show that "the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment." Trask v. Sec'y, Dep't of Veterans Affairs, 822 F.3d 1179, 1195 (11th Cir. 2016) (quoting Gowski v. Peake, 682 F.3d 1299, 1311 (11th Cir. 2012) (alteration omitted)). To establish a prima facie case Truesdale must show (1) she "belong[s] to a protected group," (2) "she was subjected to unwelcome harassment, (3) the harassment was based on a protected characteristic, (4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of . . . her employment and create an abusive working environment, and (5) a basis exists for holding [CSXT] liable." Id. (citing Gupta v. Fla. Board of Regents, 212 F.3d 571, 582 (11th Cir. 2000)). "[O]nly

12

conduct that is based on a protected category may be considered in a hostile work environment analysis." Id. (citation and alteration omitted).

Truesdale claims she satisfies her prima facie case because, unlike her white co-workers, supervisors spoke to Truesdale and sent emails to her using a hostile tone, had conversations about her with other co-workers or within their earshot, and did not defend her when customers were abusive.[10] Truesdale cannot show that the treatment she received was based on her race as opposed to her undisputedly poor performance.[11] Even crediting Truesdale's best case, the treatment she received was not nearly severe or pervasive enough to alter the terms and conditions of her employment, whether the incidents are considered singly or in combination. See id. Truesdale cannot establish a prima facie case of hostile work environment, nor can she piece together a convincing mosaic of circumstantial evidence upon which a jury could find she was harassed based on her race.

---

[10] The sweeping exaggerated statements Truesdale uses in her written response to describe these incidents are simply not supported by any admissible evidence in the record.

[11] The few isolated comments Truesdale overheard Ghourley make to others that could possibly be construed as "racial" (described above), were not sufficiently severe or pervasive as to create a hostile work environment. Additionally, Truesdale testified that she never heard Perry make any racially insensitive comments (Doc. 14-1 at Tr. 73) and she did not testify that any co-workers did either. See Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993) (explaining that Title VII is violated "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult") (quotation and citation omitted).

### C. Retaliation Claim (Count II)

Truesdale has not put forward any direct evidence of retaliation so here too the Court looks to the McDonnell Douglas burden-shifting framework, which requires Truesdale to show "(1) [she] engaged in statutorily protected activity, (2) [she] suffered an adverse employment decision,[12] and (3) the decision was causally related to the protected activity." Jones v. Gulf Coast Health Care of Delaware, LLC, 854 F.3d 1261, 1271 (11th Cir. 2017) (quotation and citation omitted). If Truesdale can establish a prima facie case, the burden shifts back to CSXT to "articulate a legitimate, nondiscriminatory reason" for her termination. Id. (quotation and citation omitted). If CSXT does so, then Truesdale "must show that the supposedly legitimate reason was in fact a pretext designed to mask illegal discrimination." Id. (citation omitted).

While not entirely clear, it seems Truesdale is arguing that the retaliation she suffered (her termination) stems from two incidents: an anonymous complaint to a CSXT ethics hotline in February 2014 about race discrimination in a hiring decision;

---

[12]The Court assumes the only "adverse employment decision" at issue in this claim is Truesdale's termination. To the extent Truesdale might be arguing the retaliation she suffered included additional adversity (other than being terminated), none of the claimed incidents rise to the level of being an adverse employment decision within the meaning of a retaliation claim. See Burlington Northern & Santa Fe Ry Co. v. White, 548 U.S. 53, 57, 65-67 (2006) (explaining that, while an adverse employment action for purposes of a retaliation claim is construed more broadly than in a discrimination claim, "the employer's actions must be harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination").

and her complaint to Human Resources about her 2013 year-end review (which complaint resulted in her scores being raised).[13] As to the first incident, while there was an anonymous complaint to CSXT's ethics hotline that a hiring panel (on which Ghourley was one of three members) engaged in race discrimination by selecting a white candidate instead of an African-American for a vacancy in February 2014 (which complaint the Court assumes to be statutorily protected activity),[14] Truesdale testified that although she had made other complaints to the ethics hotline, she was not sure that she was the person who complained about the February 2014 vacancy. Doc. 14-2 at Tr. 142-47. Furthermore, while Ghourley testified that she suspected it might have been Truesdale who made the anonymous complaint, Truesdale is unable to causally connect her termination eighteen months later to the anonymous ethics hotline complaint. Without other evidentiary support, the temporal proximity of a February 2014 complaint is too far removed from Truesdale's August 2015

---

[13]Although Truesdale's summary judgment response references "multiple complaints" she allegedly made to human resources and management about race discrimination (Doc. 19 at 6), in her deposition Truesdale could not recall telling any supervisor that race played a role in any action anyone took against her or anyone else until the day she was terminated when she says she told Toaston as Toaston escorted Truesdale from the building that Ghourley had a history of mistreating black women. Doc. 14-2 at Tr. 109-11. Thus, none of these other actions can form the basis for a retaliation claim under § 1981.

[14]The documentation of the ethics hotline complaint and investigation are of record. Doc. 14-5, Ex. 12.

The African-American candidate who was not selected was not Truesdale; she did not apply for that position.

termination to demonstrate causation. Jones, 854 F.3d at 1271-72 (explaining that a three to four month period between statutorily protected conduct and adverse employment action is too long to establish causation without other evidence).

Truesdale also claims that Ghourley resented Truesdale for complaining to HR about her 2013 year-end performance review (which resulted in Ghourley raising Truesdale's rating so that Truesdale received a raise) and that this action caused Ghourley to retaliate against Truesdale by pressuring Perry to put Truesdale on a PIP over a year later and ultimately to terminate her. Truesdale does not explain how her complaint about her review (which she does not claim had anything to do with her race) was "statutorily protected activity." See Little v. United Techs., 103 F.3d 956, 961 (11th Cir. 1997) (affirming summary judgment on retaliation claim under § 1981 where plaintiff's complaint was not about an unlawful employment practice). Even assuming that Truesdale's complaint about her year-end review was a complaint about an unlawful employment practice, it is only Truesdale's conjecture that supports her attenuated theory of subsequent retaliation by Ghourley through Perry over a year later.

Moreover, even if Truesdale could establish a prima facie case of retaliation based on either the anonymous call or the year-end review complaint, CSXT points to Truesdale's poor performance as a legitimate, non-discriminatory reason for terminating her and Truesdale has not marshaled any admissible evidence to show

16

this reason is a pretext for unlawful retaliation. As a matter of law, Truesdale cannot prove her retaliation claim.

## III. Conclusion

Accordingly, it is hereby

**ORDERED**:

Defendant CSXT's Motion for Summary Judgment (Doc. 14) is **GRANTED**. The Clerk shall enter judgment against plaintiff Ecia Truesdale and in favor of defendant CSX Transportation, Inc., and shall thereafter close the file.

**DONE AND ORDERED** at Jacksonville, Florida this 21st day of September, 2017.

TIMOTHY J. CORRIGAN
United States District Judge

s.
Copies:

counsel of record